## HAZARD POWDER CO. *v.* LOOMIS & CAMPBELL ET AL.

### (No. 6,872.)

1. An estate for years, created by a lease granting a privilege of purchase in fee, is merely a chattel interest.
2. Such chattel interest becomes subject to the lien of a judgment, only from the time of levy and seizure in execution.
3. As between mechanic liens the law allows no priority; but where a mortgage or other lien takes effect after the commencement of one or more mechanics' liens, but before the commencement of others, the latter must be postponed to the mortgage lien.
4. Where a builder or material-man has begun to furnish work or materials, toward the erection or repair of a building, without any agreement as to the amount of material or duration of his employment, but under a reasonable expectation that further work or material will be required of him to finish the undertaking, and he is afterward called upon, from time to time, to furnish the same until the building is completed, he is entitled to his lien, as though acting under an original contract for the entire labor or materials so furnished.
5. In such case no part of his claim is postponed to a mortgage or judgment lien intervening during the erection of the building, unless he had actual notice of the existence of such mortgage or judgment.
6 Two distinct accounts of a material-man can not be tacked together to

make a continuous account; the lien for each account must be taken within the four months prescribed by the statute.

SPECIAL TERM. — On motion to distribute the proceeds of sale.

In this case, a sale of mortgaged premises having been made, and the proceeds in part applied to the payment of costs, and of the plaintiffs' claim, a surplus remained of some $1,350 to be distributed among other claimants.

The premises sold consisted of a lot of land with the improvements thereon, on the south side of Third street, between Race and Elm streets, held by Loomis & Campbell, under a lease from Nathaniel Wright, dated February 13, A. D. 1850, for a term of fourteen years from date, at an annual rent of $225, with the privilege of removing any improvements made thereon during the term by the lessees, and of purchasing the premises in fee, by the payment of $8,333.33 within the term. In April, 1856, the Eagle Bank of Rochester obtained a judgment against Loomis & Campbell for the sum of $1,181.54, which was not levied upon the premises.

On the 5th of June, 1856, Loomis, in whose name the title was vested (though for the benefit of Campbell as well), executed a mortgage in favor of Elizabeth Smith, wife of one of the defendants, to secure the payment of three notes executed by Loomis & Campbell in her favor, amounting in the aggregate to $3,087.16, all of which had matured by the 3d day of September following. This mortgage was not put on record until the 7th day of November, 1856.

Meanwhile, Loomis & Campbell commenced an improvement on the lot by the erection of a wine house, for the storage and sale of wines, liquors, etc.

I. The stone work and materials for the cellar were furnished by Wm. Stevenson, under a verbal agreement made with Loomis & Campbell through Loomis. It was commenced on September 25, 1856, and is alleged to have been finished on the 10th April, 1857. On the 11th day of April,

35

1857, Stevenson filed an attested copy of his account with the recorder of the county, for the purpose of taking a lien upon the building in amount of $529.39.

II. The iron work and materials therefor were furnished by N. T. Horton, from time to time, as they were ordered, upon a running account, commencing Sept. 28, 1856, and ending Feb. 9, 1857. There was no express contract between the parties as to this work. But the work was ordered for the house and done upon it, upon an understanding between the parties from the beginning that it was to be done for that purpose. On the 17th day of April, 1857, Horton filed an attested copy of his account, amounting to $920.31, with the recorder, for the purpose of taking a lien, etc.

III. Lumber was furnished for the building by Creighton & Fairchild, Creighton & Dudley, and Robert Creighton, all of whom were represented in the matter by Robert Creighton in person. Before they commenced the delivery of any lumber, Creighton was called upon by Mr. McCullow (who was superintendent of the work, and authorized to make engagements for it), and by Mr. Loomis, personally, to furnish lumber for the building, and agreed to supply all that should be wanted, payment to be made on 1st of April, 1857. In the making of this arrangement, Creighton was spoken to personally to furnish the lumber, no regard being had to the several firms. He opened three accounts with Loomis & Campbell; one in the name of Creighton & Dudley, one in the name of Creighton & Fairchild, and one in his individual name. This was done because each of these was engaged in distinct branches of the lumber business, as to which supplies were wanted.

The accounts of Creighton & Fairchild, and Creighton & Dudley, commenced simultaneously on the 8th Sept., 1856; that of Creighton individually on the 17th Nov., 1856, the last items in the accounts of each bearing date the 15th Feb., 1857.

Creighton, on behalf of each of these claimants, filed duly attested copies of their accounts with the recorder, for the

purpose of taking liens in their behalf, on the 6th of May, 1857.

Creighton & Fairchild's account was $527.97; Creighton & Dudley's, $396.57; and Creighton's individual account, $538.50; total, $1,462.98.

*Mills & Hoadly*, for plaintiff.

*D. Thew Wright*, for the Eagle Bank of Rochester.

*Johnston & Carroll*, for Stevenson.

*Lincoln, Smith & Warnock*, for Elizabeth Smith.

*Ben. J. Horton*, for admr's of Horton.

*Bates & Scarborough*, for Creighton et al.

SPENCER, J. The Eagle Bank of Rochester claims to have the first lien upon the fund by virtue of its judgment rendered in April, 1856. No levy was made upon the premises under this judgment, and the claim has no other foundation than the mere force of the judgment. Section 421 of the Code provides " that the lands and tenements of the debtor within the county, etc., shall be bound for the satisfaction thereof from the first day of the term at which judgment is rendered."

Since the case, *Lessee of Bisbee's* v. *Hall*, 3 Ohio, 449, leases for years (not perpetual) have been regarded as chattels merely, liable to be seized and sold on execution as such, not as lands and tenements, within the above provision.

By section 421 of the Code, it is provided that chattels shall be bound from the time when seized in execution. It is claimed, however, on the part of the Bank, that the clause in this lease, securing to the lessees the privilege of purchase within the term, at a given price, alters its character in this respect, and renders it liable only to be taken as land. This principle does not *per se* alter the nature of the estate, nor enlarge the interest of the lessee. It is not a contract for

purchase, by which both parties are bound, but a mere privilege on the part of the lessee, creating no estate or interest in the land, until availed of by payment or tender of the price.

It does not present a case, therefore, analogous to that of a contract of purchase, where the contemplated purchaser enters into possession before purchase money paid. There, the possession is referred directly to the contract, and is supposed to be co-extensive with the estate to be acquired under the contract. There, possessory interest, as such, represents an estate, and, if sold at all, must be sold as represented by the contract—*i. e.*, as a fee, or for life, or for years, as the contract calls for. But in the case of a lease, possession is taken, solely with regard to the term granted; it is properly referable to that only, and must terminate with the expiration of the term; not until the privilege of purchase is complied with, can the tenant claim any other or greater estate than that granted by the term, and consequently his right of possession is no greater than that of the term itself.

The cases, therefore, which favor the doctrine, that a possessary interest in lands, accompanied by a contract of purchase in fee, may be sold on execution as land, and so as to convey the interest under the contract, do not apply to a possession secured for a term of years certain, and no longer.

The claim, therefore, of the Eagle Bank is disallowed.

2. The second claim to be considered, is that of Mrs. Smith, under her mortgage. It bears date January 6th, and as against Loomis & Campbell takes effect from delivery; but as to other incumbrancers, it only takes effect from the date of its record, which was Nov. 7th, 1856. If other incumbrances have not intervened between January and November, it is entitled to the whole of this fund. This renders it necessary to consider the state of the other claims. All of which are founded upon the mechanics' lien law. 2 Curwen, 964. The provisions of which are substantially " that any person who shall perform labor or furnish materials, etc.,

Hazard Powder Co. *v.* Loomis & Campbell et al.

for erecting or repairing any house or other building, or appurtenance, by virtue of a contract or agreement with the owner thereof, shall have a lien, to secure the same, upon such house or other building, or appurtenance, and the lot of land on which the same shall stand."

2. "That any person entitled to such lien shall make an account in writing of the items of labor, materials, etc. furnished; and after making oath thereto within four months from the time of performing such labor or furnishing such materials, shall file the same in the recorder's office, etc., who shall record the same, and said account shall, from the commencement of such labor, or furnishing such materials, and for two years after the completion of such labor, or furnishing such materials, operate as a lien on such buildings, etc., and the lots on which they stand. If furnished on a written contract, a copy of such contract shall be filed with said account."

3. That such lien shall not "interfere with prior *bona fide* liens on grounds on which such building shall be erected, if a fixture."

In the construction put upon this law by the supreme court in the case of *Choteau, et al.* v. *Thompson, et al.*, 2 Ohio St. 114, it was held, that although as to other parties, liens properly taken had effect from the commencement of the work, etc.; yet, as between the lien holders themselves, the law allows no priority, but protects all alike. As a consequence of this, where a mortgage or other lien takes effect after the commencement of one or more building liens, but before the commencement of others, the latter must be postponed to the mortgage, etc., and with it to the other building liens, while the former only are required to submit to an equal distribution. (Ib. 129). The result is, that Robert Creighton's claim being for materials wholly furnished after the 7th November (when the mortgage of Mrs. Smith went into full effect by the record), must be postponed to the mortgage and the other claims, in distribution, and so nothing is left for it.

The next claim we propose to consider, is that which arises upon the account of N. T. Horton. That account commences on the 28th September, 1856, and continues by items closely connected, until the 31st day of December, 1856, when the whole amounted to $922 41. The items after that are small, extending up to February 9, 1857, and amounting to only $16. The balance claimed is only $920 31, and therefore it is needless to consider of these latter items. Assuming the account with this building to be fully closed by the 31st December, 1856. The lien taken on the 17th April following, was within the four months allowed by law, for the termination of the account, and therefore properly chargeable upon the premises from the 28th Sept., the commencement of his account.

It is claimed, however, on the part of Mrs. Smith, that Horton's account was not the result of any express contract between him and Loomis & Campbell, for the furnishing of this iron work. But that the work was furnished from time to time, only as it was ordered or called for; that he had no written contract for furnishing this work and materials for the whole building, but that he might have stopped at any time; and that, therefore, at all events, all work, etc. furnished by him after the 7th November, must be regarded as furnished upon a contract or contracts entered into after that date, and so postponed to the mortgage. And, forasmuch as the account was not filed for record within four months of the last item prior to the 7th November, it was not filed within the time prescribed for taking a lien, and must, therefore, be wholly rejected as against the mortgage. This view of the case depends upon one of two, or perhaps three hypotheses:

1. Either that the furnishing of work upon an order, does not amount to a contract between the party and the owner, in respect to the building or repairing of the house: or 2d. That every item furnished upon such order or orders, must be regarded as an independent contract, for which liens must be separately taken, in order that all may be protected;

or thirdly : Where a party is under no engagement to furnish any given quantity of materials or labor, but such only as may be ordered, or such only as he may choose, any materials or labor furnished by him, in pursuance of such arrangement, after an incumbrance has been put upon the property, of which he has no actual, but constructive notice (arising from the mere record of the mortgage), are furnished at his peril, and can not fasten as a continuing lien upon the property.

The first of these hypotheses can certainly claim but little consideration. All that the law requires is, that the work, etc. should be furnished under a contract with the owner for the building. This contract need not be express, it may be implied from the acts of the parties. "A tacit understanding (say the court, 2 Ohio St. 125) may be as good as an express one." Where work is ordered for a building, and is done to the building, the law raises a promise to pay for it, and so there is a complete contract between the party ordering and him performing.

The second hypothesis is equally untenable, as applicable to the present case. Where work, distinct in its nature, is performed at different times, the law supposes it performed under distinct engagements, as where the work at one time is for building, and at another for repairing. So, where two distinct contracts are in fact made, as (in a case like this) distinct contracts for different parts of the work, the work done under each contract must be considered as entire of itself. But when work, etc. is done or furnished, all going to the same general purpose, as the building of a house, or any of its parts, though such work, etc., be ordered and done, at different times, yet, if the several parts form an entire whole, or are so connected together as to show that the parties had it in contemplation that the whole should form but one, and not distinct matters of settlement, the whole account must be treated as a unit, or as being but a single contract. And this I understand to be the doctrine laid down in the fifth proposition of the Choteau case, already

quoted (2 Ohio St. 126). Now it clearly appears here, that although Horton made no express contract to furnish all the material and workmanship that might be required in his line for the building of this house, yet that, such as was ordered and furnished from time to time, was so furnished on an understanding between the parties, that the whole, when finished, should constitute but one job, or furnish matter for but one settlement, and not that each item was to be settled for separately. Horton knew that the house was being built, that as each item was finished, more would be wanted until the building was completed; items were furnished from day to day and from week to week in small sums, separately considered, but in three months amounting in all to $900. It never would have entered into the mind of either party (or of the superintendent, Mr. McCullough), that all these items were furnished under distinct and independent contracts.

3. The third hypothesis is, perhaps, more difficult to dispose of.

The law provides that when work is done, etc., under a contract with the owner, the party performing such work, etc., shall have a lien upon the building, etc., and lot on which the same is erected from the commencement of the work, etc. So that when the work is once commenced, the lien attaches for all further work done under the contract, as from the beginning thereof. But the law also declares, that such liens shall not interfere with prior *bona fide* liens. If the work be done under a contract which is entire, *i. e.*, under a contract for the performance of the whole work, it would seem to be plain that when the work is once commenced, the lien has in like manner attached upon the property for the whole amount of materials or labor to be furnished; of which a subsequent incumbrancer is bound to take notice, and he can not interrupt the contract, or intercept the lien by interposing such incumbrance, between the beginning and termination of the work. In such case the incumbrance must be postponed to the lien for the entire

work, etc. The lien may be said to enter into and become part of the contract itself, as though the owner had said to the builder: "If you will perform this work or furnish these materials, you shall have a lien upon the premises for all you may do or furnish, to take effect from the commencement of your undertaking;" of which contract the subsequent incumbrancer having notice can not complain that any rights of his are violated by its full performance.

When there is no obligation on the part of the contractor to furnish any given amount of labor or material, and he may cease to supply the same at any time, without any breach of obligation, the case at least is so far different, as that a third party, obtaining a lien upon the premises, can not be said to interpose between the contractor and owner, nor to intercept any rights which the former may be supposed to have had to proceed further with the building. In such case, possibly an incumbrancer might interfere, to prevent further advances of labor and materials, to his prejudice; unless by so stopping the work other contractors are interfered with. Upon this point, however, I am not called upon to express any opinion, and do not desire to. The real question is, where a builder or material man has begun to furnish work or material toward the erection or repair of a building, under a reasonable expectation that more will be required to finish the undertaking, and is from time to time supplying the same, can a third party, acquiring or perfecting a lien, intercept his, for the whole amount of labor or materials subsequently furnished, without actual notice, or its equivalent, of his claim? Is the mere recording of a mortgage or obtaining judgment such an equivalent? It seems to me not. The law as to such a contractor is equally efficient for protection in his just rights, as to one who contracts 'or the entire work, *i. e.*, when incorporated with the contract, it is as though it had been said, by the owner to the builder: "You shall have a lien upon the premises for your work this day begun, and such as in continuation thereof, you may hereafter perform upon the building." As the

builder progresses with his work from day to day and from week to week, it is not to be expected, nor does good faith require him, as steadily, to search the records of the county to ascertain if, perchance, any judgment or mortgage has been quietly placed there. The performance of such a duty would be practically impossible. On the other hand, while a building is in progress of erection or repair, a party taking an incumbrance is put upon his guard, he knows or is presumed to know that labor and material are engaged, that the laborers and material men are acting upon an expectation of securing their just reward, by taking a lien therefor, upon the building when completed; allowing them to act upon such supposition, without notice of his interfering claim, or putting them upon guard, knowing or believing that his own security is improved by the improvement made; it is not too much to say, that in consideration of such belief, he consents that the expectations raised by his silence shall be realized, not that it must operate as a fraud to defeat them. Such is the principle of equity in analogous cases, and I do not see why it should not be applied to this.

I conclude, therefore, that the work done by Horton on this building was done on a continuing contract, commencing on the 28th day of September, 1856. That it operates as a lien from that date for the whole sum due, and that such lien is not cut off, or in any wise intercepted by the recording of Mrs. Smith's mortgage on the 7th of November, following.

The next claim I propose to consider is that of William Stevenson, for stone work done upon the building. It appears that Stevenson filed an attested copy of his account with the recorder, on the 11th day of April, 1857. In the affidavit, annexed to the account for the purpose of verifying it, it is stated that affiant began to do the work and furnish materials about the 25th day of September, 1856, and finished the same on the 10th day of April, 1857. The account itself does not show any dates whatever, except as follows; opposite to the first item, is put the year, thus:

Hazard Powder Co. *v.* Loomis & Campbell et al.

| 1856. | To 485 perch stonework, etc., @ 2,00 | 970 | 00 |
| | To 116 feet arching, @ 37½ | 43 | 50 |
| | [And so on, including deductions until | | |
| | balance is struck as follows:] | 950 | 68 |
| Nov. 19. | By cash paid on the above | 509 | 74 |
| | Balance | $440 | 94 |

Then the account proceeds:

| | To 35½ perch for area wall on Union | | |
| | street, @ 2,00 per perch | 71 | 00 |
| | To 2 arches | 3 | 00 |
| | " paving west yard | 6 | 00 |
| | | $520 | 94 |
| | Deduct, etc., (total) | 11 | 20 |
| | Balance brought over | $509 | 74 |
| 1857. | To masons, 4 days, @ 1,75 | 7 | 00 |
| | " labor, 2½ days | 2 | 50 |
| | " stone | 2 | 50 |
| | " Gravel, 3 loads, 50 cents | 1 | 50 |
| | " hauling dirt | | 75 |
| | " 6 loads sand in old account | 2 | 40 |
| | " 7 " stone " " | 3 | 00 |
| | Balance due | $529 | 39 |

The account itself does not show the date when any part of this work was finished, except that the work on the cellar was performed by the 19th of November, 185 ?, and the balance due upon it ascertained. The next items in the account relate to the area and yard, they amount to $80,00 and so far as the account shows anything were done and finished in 1856. For they are added to the old balance, and a new balance is struck amounting to $509.74. Then the account begins afresh as follows:

1857.   To masons 4 days, etc., etc.
Balance due                                    $529 39

The account being thus uncertain, the claimant exhibited proof as to the time when the various items of work were done, and of the contract under which the same was done.

It is clearly in evidence that the first part of the account, up to the date, November 19, related to work done upon the cellar walls. The second part of the account, up to the date, 1857, to the area on Union street and pavement in the yard; the third part, to the front pavement and curbing, and some fixing up of area.

The contract between Stevenson and Loomis & Campbell, as testified to by Stevenson, was, that he was to do all the stone work required about the building, payable one-half cash, and for the balance he was to take their notes; of course, notes could not be required until the work was finished. This contract, he says, was made in the presence of M'Cullough and Loomis both; M'Cullough testifies that the only contract with Stevenson was, that he was to do the cellar work, and work on the area upon Union street, at $2 per perch; Loomis testifies to the same thing; Campbell testifies that Stevenson's contract was considered finished and settled for in January, and that he solicited the job in April to save his right to a lien. The clerk of Loomis and Campbell, says that Stevenson's work was considered finished and settled for. The claimant's own account shows that the balance was ascertained before the last items of work were done, and notes were given by Loomis and Campbell to Stevenson for the exact amount due to Stevenson at that time—a thing that could not have been, unless the work had been so far done as to admit of measurement—and the proof is, that it was measured. All that remained to be done was a little pointing up, which occupied a day and a half in the spring. The subsequent work was not done by the piece, nor by the perch, as was that done in the fall and winter; it was done by the day, and so charged. The testimony is overwhelm-

ing, notwithstanding Stevenson says he was to do all the work required; that his contract was closed and settled for before the spring work was done, and that the latter was done under a new engagement, having no connection with the original one, and, so far as he was concerned, was performed to enable him to fasten it upon the old account and save the lien for both; hence, the notes were asked to be returned, the settlement opened up, and a new account made out from the beginning, as a unit. In my opinion, there was no such connection between these accounts, as to authorize a lien to be taken for the whole. In other words, the account is not entire, but several; and can not properly be treated as a continuing running account.

Now, the weight of testimony shows that in fact nothing remained to be done of the original job, other than pointing up—and even by the claimant's testimony, nothing but the pointing up of the cellar, and some refilling of area, to accommodate the new pavement, which was laid down in boards originally, remained to be done.

All this work had been settled for in January. It had been settled for as complete, on the 12th day of January. After its acceptance, by Loomis & Campbell, the claimant, to be entitled to his lien, should have taken it then, although the work, as to some minor details, might not have been finished. It should not lie in the power of a workman to leave some insignificant part of his work incomplete, with a view to subsequently finishing it up, and extending his lien beyond the time allowed by law. The time of the finishing up of a piece of work, must be the time for which a claimant's right to a settlement is complete. Here the parties have fixed that by the settlement itself, and although something may have remained to be done on the part of the claimant, it would not extend the time for taking his lien. All the work thus included in the settlement, must be considered for the purposes of the lien, as finished, but from what time? certainly from the time of its acceptance. These bills had been made out in December; no objection had been made to

them.   As to the first, in which the pointing occurs, it had been made out and accepted in November, and the balance carried to the credit of Stevenson in the books; as to the area bill, it had been made out in December, and I am satisfied that that work was finished by December 1.

This lien must, therefore, be postponed.

Next as to Creighton & Fairchild, and Creighton & Dudley.

It is certainly shown in evidence that the contract made with Creighton was to supply Loomis & Campbell with lumber for the entire building.   The prices were agreed upon at the beginning; Mr. Campbell having handed the bill to Fairchild, at the Columbia yard, who fixed upon prices, and then referred Mr. Campbell to Creighton, who finally made the contract.

It is claimed on the part of the mortgagee, that Loomis & Campbell had no contract whatever with Creighton & Dudley or Creighton & Fairchild, their engagements being made solely with Creighton.

Now, there is no doubt, that Creighton might have made out in his own individual name a bill of all the lumber, etc. furnished to Loomis & Campbell, and it would have been better for him had he done so.   In that case, he might have had a lien for all the lumber.   Since that furnished on 18th January is shown to have been furnished on the wine house and from that date to the time of filing his account, is less less than four months.   So also all the items of his individual account, being connected with the other accounts, would have gone back to 8th September, and so saved the whole.   But he did not choose to take that course.   He treated the accounts as separate, and they were so charged.

There is no occasion to say, that there was no agreement between Loomis & Campbell and Creighton & Fairchild, and Creighton & Dudley.   The accounts were made out in that way, and rendered to Loomis & Campbell and acceded to by them.   This is sufficient ratification of Creighton's doings. Loomis & Campbell by settlement are estopped from deny-

ing the severalty of the contracts and no one else can interfere, especially since by so doing, no harm is occasioned to other parties, but, as it results, a benefit.

The question remaining, then, is, was the lumber furnished on February 13, by Creighton & Dudley, and Creighton & Fairchild, furnished on account of the wine house, and if so, was it furnished on the original contract, or was that contract at an end, and this furnished on a new contract.

This case differs from Stevenson's in this, that there was no settlement between the parties, or anything to show that Creighton & Dudley knew that the work was finished; they were not bound to go from day to day to see if it was finished.

Bills had been sent in as usual, according to Creighton's statements, but not with a view to settlement.

This lumber, although furnished at a long interval, was furnished doubtless on running account—*i. e.*, the accounts were none of them considered closed. It was thus furnished on the original contract, not on a new one.

As to its being charged in several small items to each account, even had the object of Creighton in doing so, been to extend the time of lien, he might perhaps have done so. There is no evidence of the first, nor is that inference to be drawn from the mere circumstance that the items were separate; at this time, however, there was no necessity for doing so. His individual account had items as late as January 18 to 21, three months before the account was filed, and Creighton & Dudley as late as March 24, six weeks before their account was filed, and all being still within time; and if the mere object had been to fasten liens, they could have been placed to the oldest account.

It is claimed that part of this lumber was not used by Loomis & Campbell in the construction of the wine house. It is not necessary that the lumber should have actually gone into the house, if furnished for that purpose, and misused. The material-man is not bound to see to its application.

The case is within the principle of *Beckel* v. *Petticrew, 6 O.*

St. 247, viz: " That the lien extends to all the material in good faith furnished for the purpose of erecting or repairing a house in pursuance of an agreement with the owner, notwithstanding a part may subsequently be otherwise appropriated, without the consent of the party furnishing it."

Decree accordingly.